**IN THE CIRCUIT COURT FOR ST. LOUIS COUNTY**
**STATE OF MISSOURI**

|  |  |
|---|---|
| BETH PEACOCK MULLER, )<br>*individually and on behalf of* )<br>*all others similarly situated,* )<br> )<br>    Plaintiffs, )<br> )<br>v. )<br> )<br>BLUE DIAMOND GROWERS, )<br>DOES 1 through 10, )<br> )<br>    Defendants. ) | Case No. _____<br><br>**JURY TRIAL DEMANDED**<br><br>SERVE AT:<br>[BLUE DIAMOND GROWERS c/o<br>CT Corporation System<br>120 South Central Ave.<br>Clayton, MO 63105] |

## CLASS ACTION PETITION

Plaintiff Beth Peacock Muller, individually and on behalf of all others similarly situated, hereby files this Class Action Petition against Defendant Blue Diamond Growers ("BDG") and DOES 1 through 10 (collectively "Defendants") for their false, misleading, and deceptive marketing of their products constituting breach of warranty, breach of implied contract, and unjust enrichment, and, in the state of Missouri, violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

### I.   INTRODUCTION

1.  Defendant BDG markets and sells consumer food products, including a line of almonds under the "Blue Diamond" brand falsely claiming to be made in a smokehouse. The almonds are sold in plastic bags or metal canisters of various sizes, and all packages have the word "Smokehouse" prominently displayed.

2.  All of Defendant's Blue Diamond-branded almonds sold in packaging displaying the word "Smokehouse" (hereinafter, "Products") are deceptively, misleadingly, and unfairly marketed to consumers because the Products are not actually made in a smokehouse. On the contrary, instead of

1

actually being made in a smokehouse (which is a common practice in the industry), the Products are merely flavored with artificial liquid smoke.

3.      This is problematic because *real* smoked almonds – made pursuant to a time-consuming natural smoking process in a smokehouse or similar facility – are commonly sold on the market and are preferred by consumers for a number of reasons, including health-related concerns.  By falsely portraying the almonds as made in a "smokehouse," Defendant is taking advantage of this consumer preference to sell the inferior Products to consumers through deception and unfairness.

4.      Pursuant to the MMPA, such practice is illegal.

5.      In addition, and/or in the alternative to the above, since the initial offering of the Products, each and every container of the Products has borne a uniformly-worded label falsely claiming the Products are made/produced in a "Smokehouse."  That uniformly-worded false statement gives rise to additional and/or alternative claims under Missouri law.

## II.     PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff Beth Peacock Muller is a citizen and resident of St. Louis County, Missouri.

7.      Plaintiff brings this Class Action Petition individually and on behalf of a putative class of Missouri citizens, and only Missouri citizens.

8.      Defendant Blue Diamond Growers ("BDG") is a California agricultural cooperative with a principal place of business in Sacramento, California, Sacramento County.

9.      Defendant BDG, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of Missouri. BDG is the owner, manufacturer, and distributor of the Products, and is the organization that created and/or authorized the false, misleading, and deceptive packaging of the Products.

10.     The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names.

Electronically Filed - St Louis County - May 24, 2022 - 02:11 PM

Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. If necessary, Plaintiff will seek leave of Court to amend the Petition to reflect the true names and capacities of the DOE Defendants when such identities become known.

11. Venue is proper in this Court because Plaintiff was injured in this venue and lives within this venue.

12. This asserted class action comports with Missouri Supreme Court Rule 52.08 and with R.S.Mo. § 407.025(3) of the MMPA. Plaintiffs' identities can be ascertained from Defendant's records, but are so numerous that simple joinder of all individuals is impracticable. This action raises questions of law and fact common among Plaintiffs. The claims of lead Plaintiff is typical of all Plaintiffs' claims. Named Plaintiff will fairly and adequately protect all Plaintiffs' interests, and is represented by attorneys qualified to pursue this action. More specifically:

13. <u>Class definitions</u>: Plaintiff Beth Peacock Muller brings this action on behalf of herself and a class of similarly-situated Missouri citizens preliminarily-[1]defined as follows: All Missouri citizens who purchased the Products[2] during the Class Period in Missouri. The Class Period begins five years prior to the date of the filing of this Petition, and ceases upon the date of the filing of this Petition. Excluded from the Class and Subclass are: (a) any judges presiding over this action and members of their staffs and families; (b) the Defendants and their subsidiaries, parents, successors, and predecessors; any entity in which the Defendants or their parents have a controlling interest; and the Defendants' current or former officers and directors; (c) employees (i) who have or had a managerial responsibility on behalf of the organization, (ii) whose act or omission in connection with this matter may be imputed to the organization for liability purposes, or (iii) whose statements may constitute an admission on the part of the Defendants; (d) persons who properly execute and file a timely request for exclusion from the

---

[1] Plaintiff reserves the right to propose, as needed, any different or other more- or less-specific class, classes, subclass, or subclasses as Plaintiff deems appropriate for purposes of class certification.
[2] As that term and label is defined herein.

3

class; (e) the attorneys working on the Plaintiffs' claims; (f) the legal representatives, successors, or assigns of any such excluded persons; and (g) any individual who assisted or supported the wrongful acts delineated herein.

14.     Numerosity:  Upon information and belief, the Class and Subclass includes thousands of individuals on a statewide basis, making their individual joinder impracticable.  Although the exact number of Class members and their addresses are presently unknown to Plaintiff, they are ascertainable from Defendants' records.

15.     Typicality: Plaintiff's claims are typical of those of the Class because all Plaintiffs were injured by the Defendants' uniform wrongful conduct, specifically, using misleading and deceptive marketing and advertising in offering and selling the Products to Plaintiffs.

16.     Adequacy:  Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent and experienced counsel, and she intends to prosecute this action vigorously.  The interests of the Class will be protected fairly and adequately by Plaintiff and her counsel.

17.     Commonality:  Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members, such as: (a) whether the Defendant used deceptive or misleading marketing and advertising in selling the Products; (b) whether and to what extent the Class members were injured by Defendant's illegal conduct; (c) whether the Class members are entitled to compensatory damages; (d) whether the Class members are entitled to declaratory relief; and (e) whether the Class members are entitled to injunctive relief.

18.     Superiority:  This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's wrongful

Electronically Filed - St Louis County - May 24, 2022 - 02:11 PM

conduct. Thus, it would be extremely difficult for the individual Class members to obtain effective relief. A class action presents far fewer management difficulties and provides the benefits of a single adjudication, including economies of time, effort, and expense, and uniformity of decisions.

### III. BACKGROUND

19. The Products, Defendant's Blue Diamond-branded almonds sold in packaging displaying the word "Smokehouse," all make the "Smokehouse" claim in prominent fashion, on the front of the Products' packaging. The Products are sold in plastic bags and metal canisters of varying sizes and shape.

20. Examples of the Products' packaging are as follows:



a.

21. As shown, the outside packaging for the Products, regardless of size or manner of packaging, uniformly states "Smokehouse" (magnified label example):



a.

22. The back side of the Products then provides the "Ingredients", and the Nutritional Facts:

5

Electronically Filed - St Louis County - May 24, 2022 - 02:11 PM

a. **INGREDIENTS:** ALMONDS, VEGETABLE OIL (CANOLA SAFFLOWER AND/OR SUNFLOWER), SALT, CORN MALTODEXTRIN, NATURAL HICKORY SMOKE FLAVOR, YEAST, HYDROLYZED CORN AND SOY PROTEIN, NATURAL FLAVORS. PEANUT FREE. MAY CONTAIN OTHER TREE NUTS.

**Nutrition Facts**

40 servings per container
Serving Size 1oz (28g/about 28 nuts)

Amount per serving
**Calories 170**

| | % Daily Value* |
|---|---|
| **Total Fat** 16g | 20% |
| Saturated Fat 1g | 6% |
| Trans Fat 0g | |
| Polyunsaturated Fat 3.5g | |
| Monounsaturated Fat 10g | |
| **Cholesterol** 0mg | 0% |
| **Sodium** 150mg | 7% |
| **Total Carbohydrate** 5g | 2% |
| Dietary Fiber 3g | 10% |
| Total Sugars 1g | |
| Includes 0g Added Sugars | 0% |
| **Protein** 6g | |
| Vitamin D 0mcg | 0% |
| Calcium 79mg | 6% |
| Iron 1mg | 6% |
| Potassium 189mg | 4% |
| Vitamin E 7mg | 50% |
| Riboflavin 0.2mg | 15% |
| Magnesium 73mg | 15% |
| Copper 0.3mg | 30% |
| Manganese 0.7mg | 30% |

*The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

23. Notably, these portions of the packaging do nothing to clarify the fact that the Products are *not* made in a smokehouse. Indeed, to the uneducated consumer, even the inclusion of "Natural Hickory Smoke Flavor," could be misinterpreted as referring to a smoke flavor produced via a "natural" process, seemingly falsely confirming that the Products were made in a "smokehouse." Moreover, to the

6

average consumer, the inclusion of liquid smoke flavoring does not necessarily preclude the Products' having been produced in an actual smokehouse. In any event, these portions of the Products' labels simply further confuse and deceive the average consumer.

24. The average consumer remains misled by the "smokehouse" label into believing the Products were made in an actual smokehouse for many reasons, including the fact that actually "smoking" almonds is a common practice in the industry.

25. The smoking process is a manner of preparing food by cooking it (or "smoking it") over a fire containing various types of wood or wood chips. The relatively simple, but time-consuming process involves the almonds being inserted into a smoker for several hours.

26. Depending upon the type of wood used in the smoking process, the food takes on various unique flavors.

27. In addition to naturally creating unique flavors that consumers seek out, the smoking process also helps to naturally dry and preserve the flavor and nutritional value of the underlying food (such as cheese, meat, fish, and nuts).

28. For the same reasons, naturally smoked foods are preferred by consumers over foods with artificial liquid smoke flavoring. Up to 70% of consumers say they're willing to pay a premium for food products in the natural, ethical, enhanced or "less of…" categories.[3]  Other studies show that consumers are willing to pay more for all natural products because of the association with a healthy and organic diet, with as high as 88% of Americans reporting they are willing to pay more for healthier foods.[4]

---

[3] See Consumer Health Claims 3.0 The Next Generation of Mindful Food Consumption, available at https://www.lek.com/insights/ei/next-generation-mindful-food-consumption (last visited April 18, 2022).

[4] See Global Health and Wellness Report 2015, NIELSON,

Case: 4:22-cv-00707-RWS   Doc. #: 4   Filed: 07/05/22   Page: 8 of 19 PageID #: 73

Electronically Filed - St Louis County - May 24, 2022 - 02:11 PM

29. In the context of foods promoted as "smoked" or made in a "smokehouse," consumer concerns are heightened because, according to the European Food Safety Authority ("EFSA") smoke flavorings "consist of complex mixtures of substances derived from specific processes to obtain [a "smoky"] type of taste, which give rise to different safety issues."[5] In fact, that "complex mixture of substances" may contain certain compounds at levels high enough to pose a toxic risk when consumed.[6]

30. For all of these reasons, consumers seek out naturally smoked foods, including almonds, over artificially-flavored foods.

31. Thus, Defendant uses the "Smokehouse" label to confuse consumers into believing the almonds are naturally smoked in order to wrongfully capitalize on this consumer preference.

### *The "Smokehouse" Label Deceives Consumers for Multiple Reasons*

32. The term "smokehouse," according to Merriam-Webster's online dictionary, means "a building where meat or fish is cured by means of dense smoke."[7] Multiple other online dictionaries confirm that "smokehouse" is a noun describing a physical structure of some sort, such as a building, shed or room for curing food by means of smoke.

33. There are no sources that imply the word "smokehouse" could be an adjective, or relates to anything other than a structure used for curing food by means of smoke.

34. In consistent fashion, in the context of large-scale, industrial smoking processes, "smokehouse" refers to the enclosed structure through which the almonds, laid on a tray, would be inserted (usually for a period of multiple hours).

35. Thus, the term "Smokehouse," as it appears on the label of Defendants' almonds – a food

---

https://www.nielsen.com/wp-content/uploads/sites/3/2019/04/Nielsen20Global20Health20and20Wellness20Report20-20January202015-1.pdf (last visited April 18, 2022).
[5] https://www.efsa.europa.eu/en/topics/topic/smoke-flavourings (last visited April 30, 2022).
[6] https://www.foodsafetynews.com/2010/02/smoke-flavored-foods-may-be-toxic/ (last visited April 30, 2022).
[7] https://www.merriam-webster.com/dictionary/smokehouse (last visited May 2, 2022).

commonly smoked – represents to a consumer that the almonds are made in an actual smokehouse, not that they have artificial liquid-smoke flavoring.

36. Indeed, in addition to misleading consumers, Defendant's deceptive practice also violates the Food and Drug Administration's ("FDA") rules on the "labeling of spices, flavorings, colorings and preservatives." 21 CFR § 101.22 (2012).

37. According to the FDA's Rules, when a food's flavor does not come exclusively from a characterizing ingredient or processing method, but contains natural flavor derived from that ingredient or processing method, this must be disclosed to consumers on the *front* label, in addition to on the ingredient list. *See* 21 C.F.R. § 101.22(i).

38. Because the Products are represented as made in a smokehouse, even though they are not, and contain added liquid smoke flavoring, this must be disclosed to consumers on the front label.

39. The FDA, through its Warning Letters, has repeatedly warned companies that not disclosing the source of a food's smoked taste is misleading:

> If these smoke ingredients [natural smoke flavor] are added flavors, they should be declared in accordance with 21 CFR 101.22 [on the front of the label]; however, if these ingredients describe the smoking process, then they must not be listed as ingredients in the ingredient statement.[8]

40. The FDA has concluded that a label "should not include the term 'smoked'" or similar variations which misrepresent whether a food was subject to smoking, such as in a smokehouse. Instead, foods that are not made in a smokehouse should contain a prominent statement such as "'with added smoke flavor,' 'smoke flavored,' or with 'natural smoke flavor.'"[9]

41. If nothing else, the FDA's Rules reflect the fact that consumers are unquestionably

---

[8] FDA Warning Letter, Smoked Seafood, Inc. dba Little Mermaid Smokehouse, MARCS-CMS 515739, June 27, 2017, (available at: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/smoked-seafood-inc-dba-little-mermaid-smokehouse-515739-06272017).

[9] FDA Warning Letter, Walnut Creek Kitchens, Inc., CIN-15-436857-08, Nov. 27, 2014.

deceived by claims falsely portraying a product as made in a "smokehouse."

42.     Indeed, the deception is even more effective in light of the fact that, as mentioned, real smoked almonds are common, such as the examples shown below:



43.     On the other hand, in light of the above-referenced FDA guidance and the confusion deception inherent in Defendant's approach, it is notable that Defendant's competitors seem to consistently inform the consumer on the front of the package when smoke flavoring is added:



44.     As illustrated in all the above examples, when smoke *flavor* is added to almonds – rather than the almonds actually being made in a smokehouse – Defendant's competitors inform the consumer

on the front of the packaging, stating the almonds are "smoke [or smoked] flavored."

45. Here, consumers are misled by Defendant's use of the word "Smokehouse" on the Products because of the absence of a qualifying term such as "flavored."

46. Without such qualifications, consumers are misled into believing that the almonds were actually made in a "smokehouse," instead of simply having added "smokehouse flavor."[10]

47. Reasonable consumers do not expect almonds prominently labeled as "Smokehouse" to not be made in a smokehouse or at least actually smoked in some fashion.

48. Accordingly, the Products' labels are deceptive and misleading in violation of the Missouri Merchandising Practice Act, and various other Missouri laws.

49. Reasonable consumers such as Plaintiff do not have specialized knowledge necessary to identify the fact that the Products are not actually made in a smokehouse or otherwise smoked.

50. Defendant knows that consumers are willing to pay more for naturally flavored and smoked almonds, and Defendant advertises and sells the Products with the intention that consumers rely on the representation made on the front of the Products' packaging.

51. Plaintiff and other consumers purchased the Products due to their belief that the Products were made in a smokehouse.

52. Plaintiff and the Class made their purchasing decisions in reliance upon Defendant's advertised claims that that Products are made in or from a "Smokehouse."

53. Plaintiff and the Class reasonably and detrimentally relied upon the Products' front labels indicating that the Products are made in or from a "Smokehouse."

54. Plaintiff and the Class would not have purchased the Products had they known that the

---

[10] The added smoke flavor is not equivalent to being made in a smokehouse. There are at least 400 flavor compounds created when foods are made in a smokehouse that the added smoke flavor cannot accurately replicate. Additionally, when foods like almonds are exposed to volatiles in a smokehouse, they undergo chemical reactions which form additional flavor compounds added smoke cannot replicate.

Products are not made in or from a "Smokehouse."

55. Defendant's conduct threatens Missouri consumers by using false, deceptive, and misleading labels. Defendant's conduct also threatens other companies, large and small, who "play by the rules." Defendant's conduct stifles competition, has a negative impact on the marketplace, and reduces consumer choice.

56. There is no practical reason for the false or misleading labeling and advertising of the Products, other than to mislead consumers as to the actual origin of the Products being purchased by consumers while simultaneously providing Defendant with a financial windfall.

### *Allegations Relating to All Plaintiffs*

57. As noted, *supra,* since the initial offering of the Products, the containers on the front packaging of all of the Products has borne uniformly-worded labels falsely claiming the Product is made in or from a "Smokehouse" (hereinafter "False Claims").

58. In reality, for all the reasons set forth *supra,* a reasonable consumer would find that the False Claims are false, misleading, unfair, and/or deceptive.

59. Defendant, as the producer and exclusive seller and distributor of the Products, has been aware since the Products' inception, that the False Claims are in fact false.

60. Despite this, Defendants purposely made the False Claims in order to induce the false belief in consumers that they were purchasing almonds made in or from a smokehouse.

61. Plaintiff and the class members purchased the Products without being aware that the Products are not, in fact, made in or from a smokehouse.

62. Defendant possessed specialized knowledge regarding the origin and production of the Products and their clams.

63. In fact, in regard to the False Claims, the Product is a credence good because its purported "Smokehouse" label cannot be independently verified by the consumer at the time of

Electronically Filed - St Louis County - May 24, 2022 - 02:11 PM

purchase.

64. In purchasing the Products, Plaintiff and the class members had no choice but to necessarily and justifiably rely upon the False Claims as accurate.

65. Had Plaintiffs known that the False Claims were false, Plaintiffs would not have purchased the Products or would not have paid as much for the Products.

66. If, at some point in the future, the Products were improved to actually be made in a smokehouse, Plaintiffs might then purchase the Products again.

67. As the direct and proximate result of the False Claims, Plaintiff and the class members have suffered economic injury by being deprived of the benefit of the bargain they were promised by Defendant.

68. By marketing, selling and distributing the Product to purchasers in Missouri, Defendant made actionable statements that the Products were made in or from a "smokehouse," but at all times failed to disclose that the Products were not.

69. Defendant engaged in the above-described actionable statements, omissions and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression and omissions.

70. Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made.

71. As the distributor, marketer, producer, and seller of the Products, Defendant possessed specialized knowledge regarding origin of the Products which the Plaintiff and the class members could not and did not review.

72. All of Plaintiffs' claims are based on misleading statements that violate FDA regulations. Such claims do not seek to impose any additional or different obligations beyond those already required by such FDA regulations.

*Facts Particular to Plaintiff Beth Muller*

73. In or around May of 2022, Plaintiff purchased one of the Products from a third-party retailer while in Missouri. Specifically, Plaintiff purchased a 16oz. bag of Blue Diamond Almonds labeled "Smokehouse."

74. Due to the claims on the packaging, Plaintiff falsely believed she was purchasing almonds made in or from a smokehouse.

75. Plaintiff thereafter purchased the Product. Plaintiff purchased the Product primarily for Plaintiff's personal, family and household use.

76. At the time she purchased the Product, Plaintiff was unaware of the falsity of the Products' claims.

77. She discovered that such claims were false shortly after purchasing the Product in May 2022.

78. If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, she would not have bought the Product.

79. When Plaintiff purchased the Product, she was injured by Defendant's illegally deceptive, false, and misleading conduct in marketing and selling the Product.

80. Specifically, Plaintiff suffered an ascertainable loss because she did not receive the expected benefit of her bargain.

81. When Plaintiff was purchasing the Product, due to the false claims upon the Product, Plaintiff believed that she was receiving almonds made in or from a smokehouse.

82. The Product was not what it was purported to be. Plaintiff did not receive the value of what she bargained for; instead Plaintiff received a product that did not live up to one of its most-prominently advertised features.

83. Consequently, Plaintiff was damaged in the amount of the difference between the cost

paid for the Product as represented – almonds made in or from a smokehouse – and the actual value of the products.

84. Although the aforementioned facts apply to named Plaintiff, for purposes of the proposed Class, all that is relevant is that Plaintiff and the class members, Missouri citizens, each and all purchased the Products at a time within the Class Period while in Missouri.

## CAUSES OF ACTION

## COUNTS RELATING TO THE MISSOURI CLASS

### COUNT ONE: BREACH OF WARRANTY UNDER MISSOURI LAW

85. Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Class Action Petition.

86. Defendant sold the Product in its regular course of business. Plaintiff and the class members purchased the Product.

87. Defendant made promises and representations in an express warranty provided to all consumers, namely the False Claims.

88. The False Claims became the basis of the bargain between the Defendant and Plaintiff and each class member.

89. Defendant gave these express warranties to Plaintiff and each class member in written form on the labels of the Product.

90. Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty under Missouri law.

91. Defendant breached the warranty because the False Claims were false.

92. The False Claims were false when the sales took place and were undiscoverable to Plaintiff and the class members at the time of purchase.

93. All conditions precedent to seeking liability under this claim for breach of express

15

warranty have been performed by or on behalf of Plaintiff and the class in terms of paying for the Product.

94. Defendant had actual notice of the false labeling information and to date has taken no action to remedy its breach of express and implied warranty.

95. Specifically, on May 9, 2022, counsel for Plaintiff mailed to Defendant written NOTICE of Defendant's breach of express warranty to Defendant. Defendant has not meaningfully responded, and has taken no action to remedy its breach of express and implied warranty.

96. In addition, Defendant previously knew or should have known of the falsity of the False Claims on the Product due to, *inter alia,* Defendant's knowledge of the Product.

97. Defendant has nonetheless refused to remedy such breaches.

98. By placing the Product in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and the class members that the Products were accurately labeled in conformance with the law.

99. Defendant's breaches of warranty have caused Plaintiffs and class members to suffer injuries, paying for falsely labeled products, and entering into transactions they otherwise would not have entered into for the consideration paid. As a direct and proximate result of Defendant's breaches of warranty, Plaintiff and class members have suffered damages and continue to suffer damages.

100. As a result of Defendant's breach of these warranties, Plaintiff and class members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relied as deemed appropriate, in an amount sufficient to compensate them for not receiving the benefit of their bargain.

**COUNT TWO: BREACH OF IMPLIED CONTRACT UNDER MISSOURI LAW**

101. Plaintiff repeats and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

Electronically Filed - St Louis County - May 24, 2022 - 02:11 PM

102. By operation of law, there existed an implied contract for the sale of the Product between Defendant and Plaintiff and each class member who purchased the Product.

103. By operation of Missouri law, there existed an implied duty of good faith and fair dealing in each such contract.

104. By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

105. As a result of that breach, Plaintiff and each class member suffered damages.

**COUNT THREE: UNJUST ENRICHMENT UNDER MISSOURI LAW**

106. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

107. Plaintiffs plead their claim for relief in the alternative to the contract claims set forth above.

108. Plaintiff and the class members have conferred substantial benefits on Defendant by purchasing the Product, and Defendant has knowingly and willfully accepted and enjoyed those benefits.

109. Defendant either knew or should have known that the payments rendered by Plaintiff and the class members were given and received with the expectation that the Product would be as represented and warranted. For Defendant to retain the benefit of the payments under these circumstances is inequitable.

110. Through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of the Products, including the False Claims, Defendant reaped benefits, which result in Defendant wrongfully receiving profits.

111. Equity demands disgorgement of Defendant's ill-gotten gains. Defendant will be unjustly enriched unless Defendant is ordered to disgorge the unjustly obtained portion of profits for the benefit of Plaintiff and the class members.

Electronically Filed - St Louis County - May 24, 2022 - 02:11 PM

112. As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and the class members are entitled to restitution from Defendant and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

**COUNT FOUR: VIOLATION OF THE MMPA – Misleading, False, and Deceptive Marketing**

113. Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this Class Action Petition, as though fully set forth herein.

114. Defendant's acts complained of herein occurred in and emanated from the State of Missouri.

115. Plaintiff and all members of the Class are "persons" and the Products are "merchandise" as those terms are defined under the MMPA.

116. As set out in this Petition, Defendant's marketing of the Product constitutes deception, false pretense, misrepresentation, unfair practice, or, at a minimum, the concealment, suppression, or omission of a material fact in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

117. As a result of Defendant's actions, consumers, including Plaintiff, were misled or deceived that the Products they were purchasing were almonds made in or from a smokehouse.

118. Defendant's deceptive acts caused Plaintiff and the Class Members an ascertainable loss within the meaning of the MMPA.

119. Due to Defendant's illegal conduct, Plaintiffs are entitled to restitution of all funds improperly obtained by Defendants.

120. Plaintiffs have been forced to hire attorneys to enforce their rights under the MMPA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an order certifying this action as a Missouri class action and

appointing Plaintiff Beth Peacock Muller as Class representative and her counsel as class counsel. Plaintiff requests that this court find that the Defendant is liable pursuant to the aforementioned Missouri common law claims; and/or violated the MMPA, and award Plaintiffs compensatory damages, restitution, and attorneys' fees, and such further relief as the Court deems just, including injunctive relief. Although aggregate damages derived from just a percentage of the Product cost certainly will not exceed five million dollars ($5,000,000.00), nonetheless **PLAINTIFF, ON BEHALF OF HERSELF AND THE PURPORTED CLASS, HEREBY DISCLAIMS AND/OR ABANDONS ANY AND ALL RECOVERY EXCEEDING FIVE MILLION DOLLARS ($5,000,000.00).** **Plaintiff and her counsel further stipulate as set forth in Exhibit A, hereto.**

 

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*